**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Louie Josytewa,

Petitioner,

v.

United States of America,

Respondent.

No. CV-22-08193-PCT-DLR
CR-18-08300-PCT-DLR

**ORDER**

At issue is Magistrate Judge Eileen S. Willett's Report and Recommendation ("R&R") (Doc. 48),[1] which recommends that the Court deny Movant Louie Josytewa's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("Amended § 2255 Motion") (Doc. 18) without an evidentiary hearing and deny a Certificate of Appealability.

The Amended § 2255 Motion raises three grounds for relief. Ground One contains ten theories of ineffective assistance of counsel ("IAC"). Ground Two is a freestanding challenge to the admission of Movant's confession during an interview with an agent from the Federal Bureau of Investigation ("FBI"). Ground Three is a freestanding claim of actual innocence. On Ground One, the R&R recommends that the Court deny relief on all ten IAC

[1] In this order, "Doc." refers to documents filed in this habeas action. "CR Doc." refers to documents filed in the underlying criminal case, CR-18-08300-PCT-DLR. "9th Cir. Doc." Refers to documents filed in the direct appeal. "RT" refers to the Reporter's Transcript from either Movant's criminal trial or the evidentiary hearing in this habeas action, followed by the date and page number. "Ex." refers to exhibits admitted at the evidentiary hearing.

claims on their merits. The R&R recommends that the Court find Ground Two has been procedurally defaulted and therefore deny relief without reaching the merits. And the R&R recommends that the Court deny relief on Ground Three because Movant has not made a sufficiently strong showing of actual innocence to succeed on a freestanding actual innocence claim.

Magistrate Judge Willett advised the parties that they had fourteen days from the date of service of a copy of the R&R to file specific written objections with the Court. (Doc. 48 at 43.) Movant timely filed objections to portions of the R&R (Doc. 49), and the Government responded (Doc. 50). Movant does not object to the R&R's recommendations as to Ground Three, or as to his sixth, seventh, eighth, and ninth theories of IAC in Ground One. But Movant objects to the R&R's (1) rejection of the merits of his first, second, third, fourth, fifth, and tenth theories of IAC in Ground One, (2) procedural default finding on Ground Two and consequent failure to evaluate the merits of the claim, and (3) its recommendations that the Court deny an evidentiary hearing and a Certificate of Appealability.

The Court considered the objections and reviewed the R&R de novo. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1). (Doc. 52.) On Ground One, the Court overruled Movant's objections regarding his first and second IAC theories. The Court found, however, that an evidentiary hearing was necessary before it could rule on Movant's third, fourth, fifth, and tenth IAC theories. For Ground Two, the Court likewise overruled some aspects of Movant's objections but found that an evidentiary hearing was necessary before it could fully resolve this claim. The Court therefore set an evidentiary hearing to address whether Movant's trial counsel, Michael Rothman, was ineffective for (1) not using a false confessions expert; (2) inadequately cross-examining the victim's mother, Brenda Polacca ("Brenda"), about her potential motives and biases; (3) choosing not to cross-examine the victim, K.A.; and (4) not calling Adeline Adams ("Adeline") as a witness. The evidentiary hearing was also necessary to address (5) whether Movant has sufficiently proven his actual innocence to permit the Court to consider a procedurally defaulted claim and, if so, whether

the Movant's confession should have been suppressed as involuntary and/or unreliable.

The Court held this evidentiary hearing on April 22, 23 and 25, 2025 (Docs. 122, 124 and 126), after which the parties submitted competing findings of fact and conclusions of law (Docs. 139, 140) and the Court took the matter under advisement. After careful consideration, the Court overrules Movant's remaining objections and adopts the R&R, except for its recommendation that the Court deny a Certificate of Appealability.

## I. BACKGROUND

### A. The 2016 Birthday Party

Movant previously was convicted of a sex offense involving a child. When he was thirty years old, he sexually abused a nine-year-old girl. (RT 7/30/2019 at 212-15.) Movant's sexual interest in children is ongoing. When interviewed by the FBI for this case, Movant discussed a dream in which he sexually abused a young girl. (Ex. 11 at 16-17; RT 4/25/25 at 434.) He also uses a device he refers to as a "clicker" or a "stomper" to help him control his urges. (Ex. 11 at 17.) He claims that he avoids drinking too much alcohol because he does not want to lose control of himself, and that he has declined invitations to children's birthday parties to avoid problems. (Ex. 31 at 2; RT 4/25/25 at 434.)

Yet Movant was present on October 10, 2016, at a family birthday party hosted by Adeline at her home on the Hopi Reservation, where children were also present, and Movant and Adeline both drank alcohol at the event. (RT 7/31/2019 at 292-94; Ex. 31 at 2; Ex. 115 at 3.) Also present were Adeline's daughter, Brenda, and Brenda's then seven-year-old daughter, K.A. (RT 7/31/2019 at 290-294.) K.A. was near Movant at the party. (*Id.* at 296, 325-26, 347.)

After the party, Brenda noticed K.A.'s behavior change. (*Id.* at 296-99.) For example, when she got home from the party that night, K.A. refused to change into pajamas and was acting scared. (*Id.* at 297-98.) Going forward, K.A. refused to change clothes, developed poor hygiene, and would not take compliments from people. (*Id.* at 298.) K.A. also no longer wanted Brenda's assistance with bathing and would not go to Adeline's house. (*Id.* at 299.)

On November 20, 2016, more than six weeks after the party and in response to questions from Brenda, K.A. reported that Movant had touched her during the party. (*Id.*; Ex. 30.)

**B. The Investigation**

Brenda reported K.A.'s accusations to the police. (*Id.*) A Bureau of Indian Affairs ("BIA") officer responded and spoke to Brenda and K.A. at Adeline's home. (Ex. 30.) K.A. told the officer that Movant quickly touched her between the legs in her private part with his right hand without saying anything to her. (*Id.*)

The FBI then joined the investigation. (RT 7/31/2019 at 263-64.) K.A. was forensically interviewed in December 2016. (Ex. 24; Ex. 25.) K.A. disclosed that Movant reached down and touched her "privacy" (the part she uses to urinate) while she was sitting on the floor next to the couch in the living room of Adeline's house where Movant and Adeline were sitting together. (Ex. 25 at 18-19, 21, 27, 29.) K.A. said others, including Adeline, her aunt Theresa Adams ("Theresa"), and her uncle Delbert Fox, were in the living room but were looking away watching television and did not see it happen. (*Id.* at 24, 27-30, 33-34.) K.A. also said everyone was drunk. (*Id.* at 37.)

K.A. was interviewed by the FBI again in July 2019. She reported that Movant touched her on her genitals while he was seated on the couch in the living room next to Adeline during the birthday party, that Movant and Adeline both appeared intoxicated, and that Adeline was not looking at her or Movant when the touching happened. This time, however, K.A. claimed that Movant beckoned for her to sit next to him and, after touching her, told her not to tell anyone what he had done. (Ex. 33 at 1.)

K.A. also met with federal prosecutors before trial. (Ex. 33.) She again reported that Movant touched her "privacy" in the living room at Adeline's house. (*Id.*) K.A. said Adeline appeared to be intoxicated and was not looking at K.A. and Movant when he touched her. (*Id.*) K.A. also said Movant appeared to be intoxicated. (*Id.*)

**C. Movant's Confession**

Movant voluntarily appeared for an FBI interview on July 5, 2018. (Ex. 115; RT 7/31/2019 at 265.) The interviewing agent told Movant that he was not under arrest and was free to leave. (Ex. 11 at 33.) Movant was *Mirandized* and waived his rights in writing. (Ex. 105.) Movant was separately advised of his rights regarding polygraph testing. (Ex. 106.) He acknowledged these rights in writing and agreed to take a polygraph (*Id.*; Ex. 115.). During the polygraph, he was asked if he touched K.A.'s vagina, and he said "no." (Ex. 115 at 2.) He also was asked if he touched K.A.'s vagina for a sexual purpose, and he said "no." (*Id.*) The results of the polygraph indicated deception. (*Id.*) These results were not presented to the jury at trial.

Following the polygraph, the agent interviewed Movant using the Reid Technique. The Reid Technique has secured confessions, but it has also produced a higher rate of false confessions than other techniques. (RT 4/22/2025 at 28; RT 4/23/2025 at 171-72.) Throughout the interview, the agent provided Movant with information about the offense—a practice called "contamination," which is discouraged. (RT 4/22/2025 at 32-34.) Studies have shown that in over 90% of cases with proven false confessions, the investigator contaminated the interview by telling details of the offense to the suspect. (*Id.*at 33-34.)

At the start of the interview, the agent advised Movant that he did not pass the polygraph and that the agent therefore was convinced Movant committed the offense. (Ex. 11 at 2.) The agent also told Movant that getting things off his chest would make him feel better. (*Id.* at 8.) When Movant claimed he could not envision himself touching K.A. at the party, the agent suggested that the polygraph can detect a lie even if someone blocks the event from his mind and cannot remember it happening. (*Id.* at 6.) The agent also told Movant that people usually get better treatment from the prosecution when they are honest. (*Id.* at 33-34.)

Eventually, Movant admitted that he touched K.A. inappropriately. (*Id.* at 37-34.) Movant adopted some details that the agent had referenced during the interview. For example, Movant admitted that he quickly touched K.A. over her clothes on her vagina using his right hand during the birthday party at Adeline's house. But he insisted that he

could not have touched K.A. while seated on the couch in the living room and, instead, the incident must have occurred in the kitchen while they were standing to get food. (*Id.* at 38, 45.) Movant also initially reported that he touched K.A. for "a few minutes," but then adopted the agent's characterization of the incident as occurring quickly. (*Id.* at 42.) Movant offered information not previously provided to him by the agent, as well. For example, he explained that he touched K.A. "just to feel" and because it was "easy," and that he did not "feel right" and felt "sick" about it. (*Id.* at 39.)

The agent's demeanor throughout the interview was calm. (Ex. 10.) He did not raise his voice. (*Id.*) He remained an appropriate physical distance from Movant. (*Id.*) At the end of the interview, Movant agreed the agent had been professional, that the agent had not forced or tricked him into saying anything, and had not promised him anything in exchange for his statements. (Ex. 11 at 41.)

**D. Case History**

**1. The Defense Investigation**

On September 4, 2018, the Government indicted Movant on two counts: (1) Abusive Sexual Contact with a Child, in violation of 18 U.S.C. §§ 1153, 2244(a)(5), 2246, and 2247; and (2) Offense by a Registered Sex Offender, in violation of 18 U.S.C. § 2260A. (CR Doc. 1.)

Movant hired Mr. Rothman of the Suzuki Law Firm to represent him. (Ex. 21 at ¶ 3.) Mr. Rothman has been licensed to practice law since May 2015. (*Id.* ¶ 1.) At the time, he had limited experience in defending sex crime offenses. After graduating law school, he worked for three years at the Maricopa County Public Defender's Office before moving to the Suzuki Law Firm, where he was assigned this case. (RT 4/25/25 at 378.) Before that, he had handled no sex crime cases, had never cross-examined a child or crying victim, and had never litigated a motion to suppress a confession. (*Id.* at 378, 409.)

Mr. Rothman regularly met with Movant to discuss the evidence against him. (Ex. 21 at ¶ 4.) Mr. Rothman perceived Movant to be vague or unclear about whether he had committed the offense and about whether the substance of his confession was true. (RT

4/25/25 at 457.) Movant could not explain why he confessed, other than to say that he felt pressured to do so. (*Id.* at 384.)

Mr. Rothman hired an investigator with experience locating witnesses on Indian Reservations. (*Id.* ¶ 9.) He and the investigator met with Movant to discuss the evidence and possible defense witnesses. (*Id.*) The investigator traveled to the Hopi Reservation to find witnesses who were willing to testify on Movant's behalf. (*Id.* ¶ 10.) With the help of the local police, the investigator located Adeline's home. (*Id.*) Adeline was not home, but the investigator interviewed Fox and Adeline's daughter, Vanessa Adams ("Vanessa"), who also was present at the party. (*Id.*) The investigator left a card with Vanessa and asked for Adeline to call him. (*Id.*) Due to the difficulties of locating and contacting witnesses on the reservation, Mr. Rothman and the investigator believed this was the best option to contact Adeline. (RT 4/25/25 at 101.) The FBI later interviewed Vanessa and Theresa at Adeline's home. (Doc. 2-1 at 7-13.) Despite the investigator leaving his card, and both the investigator and the FBI conducting interviews of other witnesses at Adeline's home, Adeline did not contact the investigator. (Ex. 21 at ¶ 10.) Mr. Rothman testified that he would not call a witness to testify if he did not know what she would say. (RT 4/25/25 at 452.)

Mr. Rothman did not have any specialized education, training, or experience with interrogation techniques that could lead to false confessions. But Mr. Rothman was familiar with the law of voluntariness. (RT 4/25/25 at 389.) He also was familiar with the legal principle that certain types of threats could result in a confession being suppressed, but he did not believe those types of threats were made here. (*Id.*) Before trial, Mr. Rothman reviewed Movant's confession and did not believe there was a legal basis for suppression. (RT 4/25/25 at 390-91; Ex. 21 at ¶¶ 4, 7.) Mr. Rothman evaluated Movant's confession and concluded based on the totality of the circumstances that the confession was legally voluntary. (RT 4/25/25 at 436-37.) He also discussed the case with the founding partner of the law firm, Richard Suzuki, an experienced criminal defense attorney. (*Id.* at 429-30.) Mr. Rothman discussed the case with at least three other attorneys in the firm, as well. (*Id.*

at 394, 430.) Based on Mr. Rothman's review of Movant's confession, his numerous conversations with Movant, and his conversations with other attorneys in the firm, Mr. Rothman did not believe there was a basis to move to suppress. (*Id.* at 393, 459-60.)

**2. The Trial**

At trial, the Government presented expert testimony about delayed disclosure in child sex abuse cases. (RT 7/30/2019 at 170-210.) The Government then called the FBI agent to whom Movant confessed his prior sexual crime. (*Id.* at 209.) The witness testified that Movant gave a *Mirandized* statement where he admitted that he digitally penetrated a nine-year-old's vagina and tried unsuccessfully to have intercourse with her. (*Id.* at 214.) The witness also testified that Movant was convicted of the crime in federal court. (*Id.* at 215.)

The Government next called the BIA officer who spoke with Brenda and K.A. at Adeline's house. (*Id.* at 253-60.) After that, the Government called the FBI agent who interviewed Movant in this case. (*Id.* at 260.) The agent authenticated two portions of Movant's interview to be admitted into evidence, and those portions were published to the jury. (*Id.* at 272-75.) The published exhibits did not include evidence that had been precluded (the polygraph examination and evidence that Movant had committed acts of sexual abuse against other children for which he was not convicted), or Movant's admissions to prejudicial facts, such as his dream of molesting a child. (*See* Ex. 11 at 37-39, 45-46; Ex. 22.) In fact, most of the evidence regarding Movant's sexual propensity toward children was not presented to the jury because, before trial, Mr. Rothman moved to exclude such evidence (CR Doc. 40), which the Court granted except as to Movant's prior conviction. (RT 7/1/2019 at 12-13.)

Mr. Rothman cross-examined the agent about Movant's limited education, the length of the interview, and the agent's interview techniques. (RT 7/31/2019 at 276-83.) He also questioned the agent about how he repeatedly asked Movant what happened and repeatedly told Movant he would feel better if he got it off his chest. (*Id.* at 282-83.) On redirect, the Government admitted the portions of Movant's interview where he agreed the

agent had been professional, had not forced him to say anything, had not promised him anything, and that Movant had told the truth and not just agreed with what the agent said. (*Id.* at 287-88.)

Next, the Government called Brenda to testify. (*Id.* at 289.) Brenda discussed how K.A.'s behavior changed after the birthday party. (*Id.* at 298, 372.) She did not understand the changes in K.A. at the time, but after K.A. told her what happened, the changes made more sense. (*Id.* at 299.) On cross, Mr. Rothman established that Brenda knew about Movant's past, did not want him around her children, and did not like him. (*Id.* at 305.) Mr. Rothman also established that K.A. did not tell Brenda what happened for two months and that Brenda was constantly asking her questions to try to figure out what was going on. (*Id.* at 306.)

Mr. Rothman was aware that Brenda knew details of Movant's past that were not presented to the jury. (RT 4/25/25 at 441.) This included Movant's criminal sexual history, as well as a time when Brenda confronted Movant about holding children at Adeline's house. (Ex. 34 at 4.) Mr. Rothman therefore strategically limited his cross-examination of Brenda to make sure he did not open the door to those other damaging facts. (RT 4/25/25 at 441-42.)

The Government's final witness was K.A. (RT 7/31/2019 at 312.) She was ten years old when she testified. (*Id.* at 313.) K.A. acknowledged she was scared and nervous. (*Id.* at 314.) Although she had met with the prosecutor before her testimony and described how Movant touched her (Ex. 33), when the prosecutor asked about what happened in court, K.A. became nonresponsive and cried. (RT 7/31/2019 at 319-20; RT 4/25/25 at 446.) K.A. was struggling so much that the Court recommended a break. (RT 7/31/19 at 321.) After the break, a microphone was clipped to K.A.'s shirt, and the prosecutor was permitted to approach the witness stand to question her. (*Id.* at 324.) Even then, K.A. gave mostly one- and two-word answers. (*Id.* at 324-26.) K.A. would not say Movant's name. (*Id.* at 325.) K.A. would not answer when asked where Movant was in the room. (*Id.*) The prosecutor asked numerous questions about where Movant was located in the room to establish that

he was the person who touched K.A. (*Id.* at 325-26.) K.A. testified that Movant touched her “privacy,” which she uses to pee. (*Id.*) K.A. said she was scared to tell anyone what happened, but eventually told her mom. (*Id.* at 326.)

Before K.A. testified, Mr. Rothman intended to cross-examine her and to focus primarily on inconsistencies in the evidence. (Ex. 21 at ¶ 14; RT 4/25/25 at 445.) Based on what was happening in the courtroom, however, Mr. Rothman made the strategic choice not to cross-examine K.A. for several reasons. (RT 4/25/25 at 447-48.) He believed it would not be productive to question K.A. because it was “so difficult to get anything out of” her. (*Id.* at 448.) Further, evidence of many, though not all, of the inconsistencies he wanted to use with K.A. were already in evidence, and he could argue them in closing without questioning her about them. (*Id.* at 445.) Evidence that K.A. had given inconsistent accounts about whether Movant had spoken to her before or after the incident was not in the record. But attempting to elicit this inconsistency on cross-examination carried risks—the jury could have heard and credited evidence that Movant told K.A. not to tell anyone what he had done. (*Id.*)

What’s more, Mr. Rothman was aware of his large physical stature and the risk of appearing aggressive when cross-examining children. (*Id.* at 409, 451.) Mr. Rothman was concerned that he would lose credibility with the jury had he tried to cross-examine a crying child. (*Id.* at 409, 449-50.) He therefore made the strategic decision to attack K.A.’s credibility in closing arguments using the inconsistencies that already were in evidence rather than attempt to question K.A. directly about them. (*Id.* at 449.)

After K.A.’s testimony, the Government rested. (RT 7/31/2019 at 327.)

Movant chose not to testify. (*Id.* at 329; RT 4/25/25 at 433.) Mr. Rothman called Vanessa. (RT 7/31/2019 at 342.) She testified that she was living with Adeline in 2016. (*Id.* at 343.) She was at the birthday party. (*Id.* at 344-45.) Movant was sitting on the couch by the front door, and Vanessa saw K.A. near him. (*Id.* at 347-48.) But she denied seeing Movant touch K.A. (*Id.* at 349.)

After Vanessa testified, the Defense rested. (*Id.* at 351.)

In closing arguments, Mr. Rothman attacked the validity of Movant's confession. He pointed out Movant's sixth grade education. (*Id.* at 379.) He focused on "how this interview was to take place. What kind of questions were being asked. What kind of situation he was being put into." (*Id.*) He noted how the agent questioned Movant: "[He] asked the same question over and over and over and over again. Twelve times, the same question." (*Id.*) He highlighted the agent's tactics: "Just tell me what happened. Just tell me what happened. It's going to make you feel better. Just get it off your chest. It's going to make you feel better." (*Id.* at 379-80.) He emphasized that "[t]he first thing out of [the agent]'s mouth in that video is, 'It's going to make you feel better. It's going to make you feel better.'" (*Id.* at 380.) He argued that the agent "repeated it over and over and over again, until finally [Movant] gave him the answer he was looking for." (*Id.*) Mr. Rothman pointed out the inconsistencies between the witnesses' testimony and Movant's admissions: how the witnesses "said that this alleged event all took place on the couch or near the couch," while Movant "said it was by the table." (*Id.*) Mr. Rothman offered a reason for this inconsistency: the agent was "implanting the words and the answers that he wants to hear," and Movant was simply echoing the agent's words back. (*Id.*) "[The agent] says, 'Was it by the table?' 'It was by the table.' 'Were you standing up?' 'I was standing up.'" (*Id.*) Mr. Rothman argued, "[Movant] couldn't even get the facts right. He wasn't aware that it took place by the couch because it didn't happen. He gave the answers that he thought [the agent] wanted to hear. That's why he said it was by the table." (*Id.*) Mr. Rothman also focused on Movant's demeanor in the interview, how he was "very frustrated. He's extremely frustrated, and eventually he just goes, 'Okay, fine. I did it.'" (*Id.* at 381.) Mr. Rothman argued that Movant's words were not sincere; "[t]hose are the words of someone who is absolutely defeated." (*Id.*)

Mr. Rothman then argued the implausibility of Movant's crime:

> And all this is alleged to have occurred basically in the same room with everyone all together. . . . We have all these adults, all these kids, and this is the time when [Movant], who is a known sex offender, who everyone is watching him, this is the time that he's going to get up and stand up and grab a seven-year-old in front of everyone? That doesn't make any sense.

(*Id.*)

Mr. Rothman attacked K.A.'s credibility and referred to her allegation as false. (*Id.* at 377.) He also highlighted Brenda's dislike of Movant and the fact that she "is the mother of the seven-year-old who made the allegations." (*Id.* at 381-82.)

After four and a half hours deliberation, the jury foreperson reported that the jury was hung. (CR Doc. 55; CR Doc. 56; RT 8/1/2019 at 401.) On August 1, 2019, after the Court gave a modified *Allen*[2] charge, the jury convicted Movant. (RT 8/1/2019 at 401; CR Doc. 56; CR Doc. 63 ). On November 18, 2019, the Court sentenced Movant to a below-guideline sentence of 324 months, which consisted of 204 months on Count 1 and 120 months on Count 2. (CR Doc. 72; CR Doc. 73.)

**3. The Appeal**

Movant appealed and was appointed appellate counsel from the Federal Public Defender's Office. (CR Doc. 76; CR Doc. 85.) He raised four issues on appeal: (1) the admission of his prior sexual crime under Federal Rule of Evidence 414, (2) the testimony and accompanying exhibits of the Hopi Sex Offender Registration compliance officer, (3) the Court's *Allen* charge, and (4) cumulative error. (9th Cir. Doc. 11.) Movant did not raise the issues of voluntariness or reliability of his confession on appeal. The Ninth Circuit affirmed Movant's convictions. (CR. Doc. 103.)

**4. The Habeas Evidentiary Hearing**

**i. Dr. DeClue**

After Movant filed his original § 2255 Motion, he hired Dr. Gregory DeClue and subsequently filed the Amended § 2255 Motion to add a false confession expert claim. Dr. DeClue is a forensic psychologist with a Ph.D. in psychology. He specializes in forensic psychology, police psychology, psychology of interrogation and confession, detection of deception and risk assessment.

Dr. DeClue is trained in the Reid Technique. Dr. De Clue stated that the acts and procedures employed in the interrogation of Movant, especially the multiple instances of

---

[2] *Allen v. United States*, 164 U.S. 492 (1896).

contamination, are similar to facts and procedures in known cases of wrongful convictions. (Ex. 4 at 17.) Dr. DeClue opined that Movant's "confession story was psychologically coerced, [and his] confession story is unreliable." (*Id.* at 17.) In Dr. DeClue's view, Movant simply repeated back the details of the allegations that the agent had provided to him. (*Id.* at 16-17; Ex. 110(a) at 16.) He opined: "Facts and practices in this case are consistent with the possibility that [Movant's] confession story was not only psychologically coerced and unreliable, but also false." (Ex. 4 at 18.)

Dr. DeClue cites studies that suggest the rate of false confessions is less than 1%. (RT 4/22/25 at 88-89.) Dr. DeClue was unable to quantify the increased risk of a false confession based on an agent's use of the Reid technique. (*Id.* at 29.) Dr. DeClue acknowledged that "exoneration cases typically involved DNA evidence where it's proven basically beyond all doubt that the defendant who confessed and was convicted was actually not the culprit." (RT 4/23/25 at 159.) Dr. DeClue testified about other scenarios where confessions have been proven false: where it was proven conclusively that the defendant "was not there at the time," and when it's proven "that somebody else did it." (*Id.*) Movant did not present such evidence here.

Dr. DeClue was asked whether any studies extrapolate instances of proven false confessions to estimate the total percentage of all confessions that are false. He responded, "I'm not aware of a number for that." (*Id.* at 160-61.) He then testified: "I don't think that there are professional estimates that would be higher than 10 percent, and I think estimates would tend to be around let's say 5 percent." The Court asked if Dr. DeClue was making those numbers up or had a basis for saying that. He responded, "Kind of a hybrid of that." (*Id.* at 161.)

**ii. David Eisenberg**

The Government called David Eisenberg as an expert witness. At the time of the hearing, Mr. Eisenberg had practiced law for 54 years, including federal criminal law for 49 or 50 years. (RT 4/23/25 at 225-26.) Mr. Eisenberg practiced federal criminal law in the District of Arizona for almost 30 years, both as an Assistant United States Attorney and as

a defense attorney. (*Id.* at 227-28.) Mr. Eisenberg has handled hundreds of federal criminal cases in his career and has conducted approximately 50 jury trials. (*Id.* at 230-31.) He has represented many Native American defendants in the District of Arizona in cases arising from Indian Country. (*Id.*)

In his expert opinion, the use of a false confession expert is not the prevailing professional norm for a federal criminal trial in the District of Arizona. (*Id.* at 232.) Mr. Eisenberg has never encountered the use of a false confession expert in a federal criminal case in the District of Arizona, either as a federal prosecutor or as a defense attorney. (*Id.*) He acknowledged, however, that "every case is different, and every case needs to be assessed by the attorney in terms of the merits of the defense[.] . . . [I]f you come across a case in which [a false confessions expert] would be necessary, then you need to follow that." (*Id.* at 234.) For example, he testified that an attorney might need to explore whether to retain a false confessions expert if his client insists he did not commit the offense and cannot explain why he confessed. (*Id.* at 294-95.) But Mr. Eisenberg cautioned that an attorney in that situation would need to balance the benefits and risks of calling such an expert, especially when doing so might open the door to information damaging to the Defense. (*Id.* at 297-98.) Mr. Eisenberg opined that Mr. Rothman was not ineffective for not retaining a false confession expert in this case. (*Id.* at 236.) He also opined that Movant's confession was legally voluntary. (*Id.* at 243-44.)

**iii. J. Vincent Aprile II**

Movant called J. Vincent Aprile II as a witness. Mr. Aprile has spent nearly his entire career practicing law in Kentucky. (*Id.* at 344-45.) He has never practiced law in Arizona or in the Ninth Circuit. (*Id.* at 350-51.) He is not admitted to the bar in either of these jurisdictions. (*Id.*)

Mr. Aprile opined that Mr. Rothman performed deficiently by not using a false confessions expert, by not adequately cross-examining Brenda, and by not cross-examining K.A. (RT 4/23/25 at at 318-31, 339-40.) Yet Mr. Aprile did not state that he has ever used a false confession expert in his 55 years of practicing law or that he has ever encountered

another attorney using one. Yet he acknowledged that if something is the prevailing professional norm, he would at least "expect to see it sometimes." (RT 4/23/25 at 351.)

As for Mr. Rothman's cross-examination choices, Mr. Aprile acknowledged that "a lot of damaging evidence regarding [Movant's] sexual propensity for children was excluded from trial" (*Id.* at 355) and that the questions he believes Mr. Rothman should have asked Brenda and K.A. could have opened the door to additional damaging information about Movant being presented to the jury (*Id.* at 356-59; Ex. 9 at 10, 12, 14 n.4, 18-19.) Mr. Aprile also admitted that he could not say how K.A. would have answered any questions on cross-examination. (RT 4/23/25 at 360-61.)

At times, Mr. Aprile seemed to equate best practices with the minimum level of performance necessary to meet constitutional standards. Near the beginning of his testimony, the Court told Mr. Aprile that it was "not looking for the A-plus standard. I'm looking for the C-minus, the very bare minimum that an attorney must comply with to – under the *Strickland* case to practice within that standard." (*Id.* at 318.) Yet at the conclusion of Mr. Aprile's testimony, the Court noted that Mr. Aprile had been "talking about the A-plus defense tactics." (*Id.* at 343.)

**iv. Adeline Adams**

Adeline testified via Zoom. Adeline's memory of the birthday party was poor. The offense occurred in October 2016. Adeline was drinking alcohol that day. (*Id.* at 220; Ex. 33; Ex. 34.) Adeline admitted that it was "hard to remember everything" that happened at the party. (RT 4/23/25 at 214.) For example, she could not remember: if K.A. was at the party; what Movant and Vanessa were talking about at the party; when she evicted Brenda and K.A. from her home; what Movant told her about his FBI interview in July 2018; whether the FBI interviewed Vanessa and Theresa at her house; whether Movant took her grandchildren to school; who wrote the affidavit she signed; or what Movant's current investigator told her about his case. (*Id.* at 179, 193-94, 204, 207, 209, 211, 217, 220.)

Adeline's testimony also was riddled with inconsistencies. For example, she testified that she and Movant were only friends in October 2016. (*Id.* at 205.) But in her

affidavit, she refers to Movant as her "boyfriend at the time." (Ex. 27 at 1.) Other evidence in the record also establishes that Adeline was in a romantic relationship with Movant in October 2016: Movant reported that Adeline was his girlfriend, Brenda testified that Adeline and Movant were dating, and K.A. testified that Movant was Adeline's boyfriend. (Ex. 31 at 1; RT 7/31/19 at 291, 319.)

Adeline also claimed that she never would have allowed K.A. to sit by Movant at the party. (RT 4/23/25 at 189-90.) Adeline knew that Movant had committed a prior sexual offense, and she did not trust him around children because she worried he would touch them in a sexual way. (*Id.* at 202-03.) But, despite these concerns, Adeline invited Movant to the house when her grandchildren were there. (*Id.* at 203-04; Ex. 31 at 2.) And on prior occasions she even allowed Movant to take her grandchildren to elementary school. (Ex. 31 at 2.) This history undermines her testimony that she would never have allowed K.A. to sit by Movant.

Adeline also testified inconsistently about Movant's location during the party. First, she testified that she and Movant remained on the couch the entire time. (RT 4/23/25 at 216.) She swore in her affidavit, however, that they were on the couch and in the kitchen. (Ex. 27.) When confronted with this fact, Adeline changed her testimony to say they also went to the kitchen. (RT 4/23/25 at 216.) Next, she testified that she did not go anywhere else with Movant besides the couch and the kitchen. (*Id.*) She then admitted that she was also in her bedroom with Movant drinking alcohol. (*Id.* at 221.) Adeline's affidavit fails to mention this detail. (Ex. 27.)

Adeline testified that she knows K.A. was not at the party or near Movant. (RT 4/23/25 at 189, 220.) But every other witness said K.A. was. (RT 7/31/19 at 296, 320, 324-26, 347; Ex. 11 at 37-40.)

Adeline's testimony regarding K.A.'s relationship with her mother contradicted her affidavit. At the hearing, Adeline was hesitant to testify that K.A. had any sort of allegiance to her mother. When asked if K.A. was an "obedient daughter," Adeline responded, "I don't remember." (RT 4/23/25 at 191.) When was asked if K.A. usually obeyed her mother,

she responded, "Sometimes." (*Id.*) Adeline admitted that K.A. has "different feelings all the time" about her mother. (*Id.*) She also admitted that K.A. was upset that she had to spend additional time with her mother after she reported that Movant had touched her. (*Id.*) In her affidavit, however, Adeline asserted that K.A. would do what her mother told her to do. (Ex. 27.)

Given her poor memory, the discrepancies between her affidavit and her hearing testimony, the internal inconsistency of her testimony, and the inconsistency of her testimony with other record evidence, the Court finds Adeline not credible.

Even if the Court credited Adeline's testimony that she did not see Movant touch K.A., the Court does not credit her belief that Movant could not have touched K.A. without her noticing. As described by K.A. and Movant, the touching would have occurred quickly and discreetly. Adeline was drinking alcohol with Movant during the party, even though there were children around. The evidence also suggests that Adeline probably was distracted during the party. Many adults and children were present, walking in, out, and around the house, and Adeline was speaking with other people at the party. (RT 4/23/25 at 214-25.) What's more, Adeline sat next to Movant on the couch, side-by-side. (*Id.* at 217.) In this position, she would not have been looking at Movant. It therefore is unsurprising that Adeline did not notice Movant quickly and discreetly touch K.A.

Finally, despite claiming that her testimony included really important information that she would have wanted to share to help Movant (*Id.* at 212), the history of the Defense investigation reveals little effort on Adeline's part to assist Movant before or during trial. Numerous investigators were regularly at Adeline's house in connection with this case. (*Id.* at 210-11.) Brenda and K.A. met with a BIA officer to report this case at Adeline's house. (*Id.* at 211; Ex. 30 at 1.) Movant's investigator sent by Mr. Rothman interviewed Vanessa at Adeline's house. (RT 7/30/19 at 255; Ex. 29; RT 4/23/25 at 211.) Adeline testified that this investigator also contacted her before the trial in 2019. (RT 4/23/25 at 194-95.) Adeline specified that she spoke to two investigators: the first investigator before trial, and then later Habeas Counsel's investigator. (*Id.* at 209.) The FBI also interviewed Vanessa and

Theresa at Adeline's house. When Vanessa testified at trial, she lived at Adeline's residence. (RT 7/31/19 at 301, 345.) Still, Adeline did not accompany Vanessa to trial, nor did she make efforts to report the information she had to the BIA, the FBI, or Mr. Rothman, despite the constant presence of investigators and agents at her home. The first time she reported her knowledge of the day's events to anyone was more than six years later when Movant's current investigator had her sign an affidavit. (RT 4/23/25 at 195-96, 209, 212-13.) This history undermines Adeline's credibility.

## II. LEGAL STANDARD

Under § 2255, a federal inmate may move to vacate, set aside, or correct a sentence on grounds that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). To obtain relief, a movant must demonstrate the existence of a substantially injurious constitutional error. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003).

## III. ANALYSIS

### A. Ground One – IAC

IAC claims are governed by the standard in *Strickland v. Washington*, 466 U.S. 668 (1984), under which a movant "must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial." *Massaro v. United States*, 538 U.S. 500, 505 (2003). Under the first prong of this test, a movant must establish that counsel's representation fell "below an objective standard of reasonableness" as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 687-88. There is a "strong presumption that counsel's performance falls within the wide range of professional assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). "A reasonable tactical choice based on adequate inquiry is immune from attack under *Strickland*." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997).

"*Strickland* does not guarantee perfect representation, only a reasonably competent

attorney." *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (internal quotation marks and citations omitted). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "The test is not whether another lawyer, with the benefit of hindsight, would have acted differently, but whether 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland*, 466 U.S. at 687, 689).

To establish prejudice, a movant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Id.* (quoting *Strickland*, 466 U.S. at 693, 697). "When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice." *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998).

Movant initially raised ten claims of ineffective assistance of counsel. (Doc. 18; Doc. 20.) Four remain before the Court: whether Mr. Rothman was constitutionally ineffective for: (1) not calling Adeline as a witness; (2) not adequately cross-examining Brenda regarding her potential biases and motives; (3) choosing not to cross-examine K.A; and (4) not using a false confession expert.

**1. Failure to Call Adeline as a Witness**

The Court allowed Movant's claim regarding Adeline to proceed so the Court could assess her credibility "during an evidentiary hearing." (Doc. 52 at 4.) Having done so, the Court finds that Mr. Rothman was not ineffective for failing to call her as a witness.

The Court finds that Mr. Rothman made professionally reasonable efforts to contact Adeline before trial. He retained an investigator with experience locating witnesses on Indian Reservations. The investigator located Adeline's residence, interviewed two witnesses there, and left a card asking for Adeline to call. She never did, despite considerable evidence that she knew the Defense was conducting a pre-trial investigation.

Mr. Rothman was not objectively unreasonable for not calling a witness who, it seems, refused to speak with him. To the contrary, it would have been risky for Mr. Rothman to call a witness without knowing what she would say. Movant argues that Mr. Rothman could have subpoenaed Adeline and interviewed her if she showed up before trial. (RT 4/25/25 at 473.) But this argument assumes Adeline would have responded to the subpoena. The record does not support this. For starters, Adeline did not even appear in person for the evidentiary hearing in this matter. More importantly, however, Adeline had ample opportunities to report her knowledge before trial had she wished to do so. The BIA, the FBI, and the Defense investigator all conducted pretrial case-related interviews at her house. Vanessa was living with her when she traveled to Flagstaff to testify at trial. Yet Adeline remained silent the entire time. It is inconceivable that Adeline was unaware of the pretrial investigation. Yet Adeline did not make a statement about this case until more than six years after the fact, when Movant's current investigator had her sign an affidavit prepared by someone else.

Even assuming Mr. Rothman should have made greater efforts to interview Adeline before trial, Movant has failed to show a substantial likelihood that he would have been acquitted had Adeline testified at trial. Adeline was not a credible witness for many reasons. She gave inconsistent answers about the nature of her relationship with Movant. She claimed in her affidavit that Movant was only in the kitchen and living room during the party, omitting that he had been drinking alcohol in her bedroom. She claimed she did not recall K.A. being at the party. Adeline's memory of the party was poor. She admitted she had been drinking alcohol that day. Numerous witnesses described her as intoxicated. Adeline said it was hard to remember what happened at the party, and she repeatedly was

unable to recall details when asked. There is also evidence that Adeline was distracted at the party: she testified that people were coming and going out of the house, that various family members were in the living room, and that she looked at them and spoke to them. She also said she was sitting next to Movant on the couch, where she would not have been facing him. Adeline insists that she did not see Movant touch K.A., and that he could not have done so without her noticing. Although it is credible that Adeline did not witness Movant touch K.A., it is not believable that he could not have done so without her noticing. As described by both K.A. and Movant, the touching occurred quickly and discreetly. It therefore is unsurprising that Adeline did not see it, especially given the distractions in the room. Indeed, K.A. said repeatedly that Adeline was not looking when Movant touched her.

Finally, had Adeline testified, it is likely that the jury would have heard information damaging to Movant. For example, Adeline admitted that she did not trust Movant around children because she was aware of his past and was worried that he would reoffend. Such testimony would have been damaging to the Defense.

Accordingly, the Court denies relief on this claim.

**2. Cross-Examination of Brenda**

Movant has failed to establish that Mr. Rothman was ineffective in his strategic choices regarding the cross-examination of Brenda.

A defense attorney's decisions regarding the manner and scope of cross-examination are afforded great deference and need meet only objectively reasonable standards. *See Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000). Mr. Rothman made a reasonable strategic choice about how to approach his cross-examination of Brenda. He impeached Brenda with available and admissible evidence that was not unfavorable to Movant. On cross-examination, Mr. Rothman established that Brenda knew about Movant's past, did not want him around her children, and did not like him. He also established that K.A. did not tell Brenda what happened for two months, even though Brenda was constantly asking her questions to try to figure out what was going on.

Movant argues that Mr. Rothman should have gone further. For example, Adeline testified that Movant used to give Brenda rides and money but stopped doing so after the party. Movant suggests that Mr. Rothman should have questioned Brenda about this. But even if Adeline's testimony on this point were credited, it is unclear from this record whether Movant stopped providing Brenda with rides and money before K.A.'s allegations or after. What's more, the notion that K.A. would have falsely accused Movant at her mother's urging is undermined by Adeline's testimony that she "could not remember" if K.A. was an obedient daughter, that K.A. only "sometimes" obeyed her mother, that K.A. had "different feelings all the time" about her mother, and that K.A. was upset she had to spend additional time with her mother after her disclosure was reported to the police, all of which suggest K.A. was not the type to reflexively follow her mother's commands.

Movant also argues that Mr. Rothman should have presented evidence that Brenda had assaulted Movant. Had Mr. Rothman broached this subject, however, it would have opened the door for Brenda to testify that she often observed Movant carrying small children at Adeline's house, told him to leave the children alone, and shoved him only after he told her to leave him alone because the children he was carrying were not hers. It was reasonable for Mr. Rothman to avoid a line of cross-examination that risked eliciting this information, particularly since Brenda had admitted that she did not like Movant.

For these reasons, Mr. Rothman's strategic decisions regarding Brenda were objectively reasonable. But even assuming they were not, Movant has not shown prejudice. Had Mr. Rothman followed the course now suggested by Movant, the benefit to his defense would have been marginal, but the risks would have been substantial. Brenda was aware of details about Movant's past that were not presented to the jury, including Movant's criminal sexual history and his frequent holding of children at Adeline's home. Had Mr. Rothman asked Brenda detailed questions about her knowledge of Movant's past (as suggested by Mr. Aprile), additional damaging information about Movant probably would have been presented to the jury. Mr. Aprile acknowledged that this would not have helped Movant.

Movant has thus failed to show a substantial likelihood that the outcome of trial would have been different had Mr. Rothman asked the questions now suggested by Mr. Aprile. To the contrary, the Court finds that doing so probably would have opened the door to information damaging to the Defense. The Court therefore denies relief on this ground.

**3. Decision Not to Cross-Examine K.A.**

Mr. Rothman's decision whether to cross-examine K.A. was a strategic choice that is entitled to great deference. *Wood*, 211 F.3d at 487. Before K.A. testified, Mr. Rothman planned to cross-examine her. Once K.A.'s testimony began, however, it became clear that doing so would present risks.

K.A. was only ten years old when she testified. She was visibly upset and struggled to testify on direct. She refused to say Movant's name. She would not answer the Government's questions about what happened. She began to sob during her testimony. The Court suggested taking a break so she could gather herself, after which numerous accommodations were made for her. Even with those accommodations, and even though Government counsel had met with K.A. several times, she was only able to offer very brief answers, often only one or two words.

Mr. Rothman is a physically large man, and he is aware of how his size can impact the dynamics of his witness examinations. Mr. Rothman did not want to approach K.A. to question her the same way the Government did because of how that would appear to the jury. He believed such an approach would backfire and that he would lose credibility.

Further, although Mr. Rothman intended to confront K.A. with inconsistencies in the evidence, many of those inconsistencies were already in evidence. Mr. Rothman reasonably chose to focus on them in closing rather than try to question K.A. about them.

What's more, even assuming Mr. Rothman should have attempted to cross-examine K.A., Movant has not shown a substantial likelihood of a different outcome. Had Mr. Rothman questioned K.A. as Mr. Aprile suggests in his report, he would have opened the door to damaging information about Movant that was not otherwise presented to the jury. For example, had Mr. Rothman attempted to elicit from K.A. that she gave inconsistent

accounts about whether Movant had spoken to her at the birthday party, the jury probably would have heard that Movant told K.A. not to tell anyone what he had done. Furthermore, Mr. Aprile acknowledged that he could not say how K.A. would have answered any questions on cross-examination, making Movant's prejudice arguments speculative.

Movant criticizes Mr. Rothman for commenting on K.A.'s bravery. Although in hindsight Mr. Rothman probably should have tempered his praise for K.A., Movant has not shown a substantial likelihood that he would have been acquitted but for Mr. Rothman's comment. Indeed, Mr. Rothman strongly challenged K.A.'s credibility during closing arguments.

At bottom, Movant complains about Mr. Rothman's reasonable strategic decisions. Although another defense attorney, especially with the benefit of hindsight, might have made different strategic choices, "[m]ere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation." *Gustave v. United States*, 627 F.2d 901, 904 (9th Cir. 1980). The Court denies relief on this claim.

**4. Failure to Present a False Confessions Expert**

Movant has not shown Mr. Rothman was constitutionally deficient for failing to use a false confessions expert.

First, Movant has not met his burden of establishing that the use of a false confession expert was the prevailing professional norm for a federal criminal trial in the District of Arizona when his trial occurred. Movant identifies no federal criminal case from the District of Arizona where a false confession expert was used at trial. Movant identifies no case from any jurisdiction where an attorney was found ineffective for failing to call a false confession expert. Movant did not submit an affidavit from an attorney who has ever called a false confession expert in a federal criminal trial in the District of Arizona.

Movant attempts to address this lack of evidence by citing general American Bar Association Defense Standards. (Doc. 20 at 56.) Those standards, however, say nothing about false confessions experts and, in any event, are aspirational guides. S*ee Strickland*, 466 U.S. at 688-89. The question for this Court, however, is whether an attorney's

representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105.

Movant's presentation at the evidentiary hearing did not fill these gaps. Movant did not produce a witness who has ever called a false confession expert in a federal criminal trial in the District of Arizona. Instead, he called Mr. Aprile, who has never practiced law in Arizona or the Ninth Circuit, and who did not claim in his testimony or report that he has ever used a false confession expert in more than 50 years of practice. Additionally, Mr. Aprile seemed unable to distinguish between best practices and the minimum level of competence required under *Strickland.* Mr. Aprile's testimony, which the Court contemporaneously described as being about "A-plus representation." is not responsive to the Court's inquiry under *Strickland*.

In contrast, Mr. Eisenberg opined that the use of a false confession expert is not the prevailing professional norm for a federal criminal trial in the District of Arizona. Like Mr. Aprile, Mr. Eisenberg has never encountered the use of a false confession expert in a federal criminal case (let alone trial) in the District of Arizona. Although Mr. Eisenberg acknowledged that in some cases—particularly where a defendant confesses, insists that he did not commit the offense, and cannot explain why he confessed other than to say he felt pressured—a defense attorney might need to consider consulting a false confessions expert, he quickly qualified this by cautioning that an attorney in that situation would need to balance the benefits and risks of calling such an expert, especially when doing so might open the door to information damaging to the Defense.

Such is the case here. Dr. DeClue's opinion rests largely on the FBI agent's exaggeration of "the accuracy of the polygraph as lie detector." (Ex. 4 at 16.) But testimony regarding the polygraph would have been damaging for Movant, as it would have told the jury that he failed the polygraph when he initially denied touching K.A. Further, if Dr. DeClue opined on the reliability of Movant's confession, he would have been subjected to questioning about other prejudicial evidence that was not presented to the jury (as he was

at the evidentiary hearing), including Movant's prior sexual abuse of children, his explanation of how he uses a device to help control his sexual urges toward children, how he limits the amount of alcohol he drinks because he does not want to lose control of himself and go back to jail, how he does not attend children's birthday parties because he wants to "avoid problems," and how a complaint was filed after he took Adeline's grandchildren to elementary school. Even Mr. Aprile acknowledged that it would not have helped Movant if this information had been presented to the jury.

For these reasons, the Court finds that Mr. Rothman was not objectively unreasonable for failing to call a false confession expert to testify at trial. But even assuming he should have consulted one, Movant has not shown a substantial likelihood of a different outcome had Mr. Rothman done so. First, Mr. Rothman covered much of the same territory in closing arguments that Dr. DeClue would have covered in his testimony: Movant's confession was unreliable because he was simply repeating back the information from the agent, and Movant's confession did match K.A.'s disclosure. Although an expert like Dr. DeClue also could have offered evidence that false confessions occur and that the agent's interrogation tactics are often seen in cases of proven false confessions, calling such an expert would have opened the door to prejudicial information, such as the result of the polygraph, that was not presented to the jury, which would have been damaging to Movant.

The Court therefore denies relief on this ground.

**B. Ground Two – Freestanding Challenge to Admission of Confession**

In Ground Two, Movant challenges the admission of his confession on voluntariness and reliability grounds. The Court rejects this challenge. Movant did not raise this issue on direct appeal. It is procedurally defaulted, and Movant has failed to excuse this procedural default by establishing his actual innocence. Even if the claim were not procedurally defaulted, Movant's confession would not have been suppressed as involuntary, and there is no legal merit to Movant's argument that his confession could have been suppressed or stricken from the record based on the Court's independent

assessment of its reliability. In any event, Movant's confession was adequately corroborated by independent evidence at trial.

**1. Procedural Default**

A § 2255 movant procedurally defaults all claims not raised in his direct appeal, except for ineffective assistance of counsel claims. *See Massaro v. United States*, 538 U.S. 500, 504-05 (2003). "To challenge a conviction in a § 2255 proceeding based upon a claim of error that could have been raised on direct appeal but was not, a [movant] must demonstrate both cause to excuse the procedural default, as well as actual prejudice resulting from that error." *United States v. Seng Chen Yong*, 926 F.3d 582, 590 (9th Cir. 2019).

Here, Movant does not attempt to meet the cause and prejudice standard. Instead, he asserts that his procedural default should be excused because he is actually innocent. A movant who otherwise would be procedurally barred from presenting a constitutional claim may obtain review of the claim by demonstrating actual innocence. *Schlup v Delo*, 513 U.S. 298, 314-15 (1995). "'Actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

"[C]laims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324. The movant "must offer new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Gable v. Williams*, 49 F.4th 1315, 1322 (9th Cir. 2022) (citation and internal quotation marks omitted). "*Schlup* is demanding, and cases satisfying it have typically involved dramatic new evidence of innocence." *Id.*

Movant has failed to meet this demanding burden. He relies on the testimony of Dr. DeClue and Adeline. Although Dr. DeClue's testimony that false confessions occur and that certain techniques used during Movant's interrogation are often seen in cases of proven false confessions, many of his observations about the manner and circumstances of Movant's interrogation are not new. Mr. Rothman covered similar terrain in his closing argument based on evidence already in the trial record. Dr DeClue might have done so

more thoroughly or persuasively, but it cannot be said that the jury was completely unaware of the circumstances of Movant's interrogation and why those circumstances might have produced an unreliable confession when it rendered its verdict. And, for reasons already discussed, Adeline was not a credible witness.

Movant's burden "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Schlup*, 513 U.S. at 329. Movant fails to make this showing here. Accordingly, his claims regarding the admissibility of his confession are procedurally defaulted.

**2. Merits**

Even if Movant's freestanding admissibility claims were not procedurally defaulted, the Court would find that Movant's admissions were legally voluntary and that there would have been no basis for excluding his admissions as unreliable.

The test for voluntariness is "whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). Here, Movant received *Miranda* warnings, waived those rights, and chose to speak to the FBI. This is not the rare case in which a confession following adequate *Miranda* warnings was nonetheless legally involuntary. Movant voluntarily appeared at the FBI for an interview. He was fifty-seven years old at the time. He is fluent in English and experienced in the criminal justice system. He was advised that he could refuse to take the polygraph, refuse to answer questions, and end the testing at any time. The agent repeatedly told Movant that he only wanted to hear the truth about what happened and did not want Movant to just agree with him. The agent reminded Movant that he was not under arrest and was free to leave. The agent's tone throughout the interview was professional, he maintained an appropriate physical distance from Movant, and Movant was seated closer to the door. At the end of the interview, which only lasted about forty-five minutes, Movant agreed that the agent had been professional, had not

forced him to say anything, and had not tricked him or promised him anything. When the interview was done, Movant left the FBI office with his sister. Based on the totality of the circumstances, Movant's admissions were legally voluntary.

Movant argues that his confession was involuntary due to the agent's "implied threats." (Doc. 20 at 66-69.) The Court rejects this argument. An "agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect." *Guerrero*, 847 F.2d at 1366. The same is true for an agent encouraging a suspect to tell the truth. *Balbuena v. Sullivan*, 980 F.3d 619, 629 (9th Cir. 2020) (citation omitted). And an agent may inform a suspect of polygraph results and potential consequences for lying without rendering a subsequent confession involuntary. *United States v. Haswood*, 350 F.3d 1024, 1029 (9th Cir. 2003). Accordingly, Movant's confession was legally voluntary.

Movant's reliability argument reflects a misunderstanding of the law. There is no legal authority to support Movant's argument that his confession was inadmissible based on its claimed unreliability. "[I]t is the exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts." *United States v. Kelly*, 527 F.2d 961, 965 (9th Cir. 1976). Credibility determinations "are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Here, the jury was instructed: "It's your duty to weigh and evaluate all the evidence received in the case and, in that process, to decide the facts." (RT 7/31/2019 at 351.) The jury was further instructed: "You may have to decide which testimony to believe and which testimony not to believe. . . . Sometimes different witnesses will give different versions of what happened." (*Id.* at 355-56.) The jury also was instructed:

> You've heard testimony that [Movant] made a statement. It is for you to decide (1) whether [he] made the statement; and (2) if so, how much weight to give it. In making those decisions, you should consider all the evidence about the statement, including the circumstances under which [Movant] may have made it.

(*Id.* at 357.) It would have been improper for the Court to usurp this role, determine for itself that Movant's confession was unreliable, and exclude it from evidence on that basis.

The *corpus delicti* rule does not change this conclusion. Whether Movant's confession was corroborated or contradicted by other evidence has no bearing on its admissibility. Rather, the extent of corroborating evidence is relevant only to determine whether the Government produced sufficient evidence at trial to sustain a conviction. *See, e.g.*, *United States v. Corona-Garcia*, 210 F.3d 973, 978 (9th Cir. 2000) ("[I]n order to serve as the basis for conviction, the government must also adduce some independent corroborating evidence."). Movant's argument that his confession was inadmissible because it lacked sufficient corroboration is wrong. The admissibility of evidence and the sufficiency of evidence to support a conviction are different issues with different legal standards. Movant confuses the two and asks the Court to apply the law on the sufficiency of evidence to whether his confession was admissible. The Court declines to do so.

At the evidentiary hearing, Movant advanced the theory that Federal Rule of Criminal Procedure 29 allows the Court to retroactively strike a confession from evidence after the Government has rested. This is wrong. Rule 29 by its own terms provides one remedy when the evidence is insufficient to sustain a conviction: a judgment of acquittal. The rule does not allow the Court to strike evidence that was already admitted. Indeed, at the evidentiary hearing, Movant asked Mr. Eisenberg, "At Rule 29, after a defendant's statement has been put in, if there's no corroboration, the defense counsel can move to strike the entire confession. You're aware of that?" Mr. Eisenberg answered, "No." (RT 4/23/25 at 280.)

Movant's confession could not have been suppressed based on the Court's determination of its reliability, nor could his confession have been stricken from evidence at a Rule 29 motion. Corroboration goes solely to the sufficiency of the evidence to support a conviction, not to the confession's admissibility in evidence. And Movant has never challenged the sufficiency of the evidence to sustain his conviction at any stage of his case. Accordingly, the sufficiency of the evidence—and the related question of whether

Movant's confession was sufficiently corroborated—is not properly before the Court.

Even if the issue were properly before the Court, the Court would find that Movant's confession was sufficiently corroborated by other evidence at trial. "[T]he *corpus delicti* rule does not require the government to introduce evidence that would be independently sufficient to convict the defendant in the absence of the confession," nor does the rule require independent evidence "of every element of the crime." *United States v. Niebla-Torres*, 847 F.3d 1049, 1054-55 (9th Cir. 2017) (quotations and citations omitted). Instead, the Government must "introduce corroborating evidence to support independently *only* the gravamen of the offense." *Id.* (emphasis added). The "gravamen" of an offense is simply "the conduct at the core of the offense[.]" *United States v. Corona-Garcia*, 210 F.3d 973, 978 (9th Cir. 2000). Evidence corroborates a confession if it "fortifies, augments, or supports it[.]" *Id.* at 979. In a child sex abuse case such as this one, "touching is the central element of engaging in a sexual act with a minor." *United States v. Lee*, 315 F. Supp. 2d 1038, 1042 (D. Ariz. 2003).

The Government presented direct evidence of Movant's crime: K.A. testified that Movant touched her genitals. This evidence alone is sufficient to corroborate the gravamen of the offense. Though Movant's and K.A.'s accounts differed in some respects, notably where in the house Movant touched K.A., most other details were the same, including the date, time, location, and criminal act. The Government also presented independent evidence that Movant has a sexual propensity to molest children, that he and K.A. were both at the party, that K.A. was near him, that K.A.'s behavior changed after that night, and that K.A. eventually told her mother what happened. Accordingly, Movant's confession was sufficiently corroborated by independent evidence to support his conviction.

**IT IS ORDERED** that Movant's remaining objections to the R&R are overruled, the R&R (Doc. 48) is adopted, and the Amended § 2255 Motion (Doc. 18) is denied.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is granted as to Movant's fifth and tenth IAC theories regarding Mr. Rothman's failure to cross-examine

K.A. or to use a false confession expert. A Certificate of Appealability is denied as to the remainder of the Amended § 2255 Motion because Movant has not made a substantial showing of the denial of a constitutional right and reasonable jurists would not find the Court's procedural ruling as to Ground Two debatable.

**IT IS FURTHER ORDERED** that the Clerk of the Court enter judgment accordingly and terminate this case.

Dated this 19th day of August, 2026.

Douglas L. Rayes
Senior United States District Judge